**Objections: Case Crosby v Core Civic  Case Number 2:20-cv-02847-TLP-tmp**

RECEIVED

2020 DEC 14  AM 7: 59

M. GOULD
INWD O. IN MEMPHIS

In objection to the decision of 12/01/2020 to dismiss my case I offer the following as further support of my claim of racial discrimination.

In July of 2018 I was hired as the Health Services Administrator for CoreCivic at West Tennessee Detention facility in Mason, TN.  Only weeks after being hired we received a decision by the audit organization NCCHC that the facility(more specifically the medical department) was placed on probationary accreditation and were given until January 2019 to correct all of the findings or risk losing the accreditation permanently in which case the facility would lose its contract with the U.S. Marshalls.

The findings that resulted in this probation were all deficiencies that occurred under the leadership of the former HSA Thomas Corman a white male and Acting HSA Constance Howell a white female.  Prior to accepting the position, I was told that the previous HSA Mr. Corman had been removed from the position at the behest of the US Marshall's monitor for failing to provide services adequately and was immediately allowed to transfer to another Core Civic position as HSA.  The following are a few of the incidents that occurred while I was in Leadership at CoreCivic.

1. When I was brought on board- there were only 4 full time nurses at CoreCivic, and by the time I left the department was fully staffed with 8 full time nurses and 2 part time, as well as, 4 contract nurses.  When initially hiring nurses to come on board my efforts to staff the department were hampered by the contract monitor Koreem Rhodes who was not signing off on new hires and therefore continuously delaying the start time and leaving the department short staffed.  These concerns were reported to my superiors in a request for assistance, but no action was taken until more than a month after the staff was first offered the job, even with contract nurses.  Prior to me taking over from my 2 white predecessors, the contract nurses were brought in with little to no delay.

2. I was not allowed to discipline white medical staff, even though they were under my department- there was 1.  1) Amberly Chiarella-who worked as the dental hygienist was to be disciplined on this occasion, prior to her ultimate termination for another disciplinary action, as a result of bringing contraband into the department and being involved in a medical procedure outside of her scope of practice.  Both actions were removed from my command and handled by the white assistant warden, although I was constantly encouraged by the security leadership to "take command and start writing some of these people up."  Therefore Ms. Chiarella's disciplinary action consisted of a minimal suspension and did not meet the guidelines for such behavior per policy.  The 2nd time Ms. Chiarella was brought up to be disciplined, it was related to report by fellow employees that she had made racist and ageist remarks regarding me as the HSA (race) and the dentist she worked for (a white male over 60).  Although Ms. Chiarella admitted to making some of the remarks attributed to her, the investigator(s) told the Warden that there was no proof of either racism or ageism and felt that it was a simple case of other employees not getting a long with Ms. Chiarella because she was a "young attractive blond." Ms. Chiarella was set to come back to work when it was discovered she had falsified and destroyed or disposed of legal documentation and after that proof was presented, she was

terminated by the warden-not me as the HSA.  The numerous write ups by the US Marshall's monitor increased even more after that, in that Ms. Chiarella was a close confidante of Mr. Rhodes.  Prior to Ms. Chiarella's termination, the dental department, which was under my leadership as well, was always separated in the two-way memos and notice of concerns and were often reported as there being no ongoing problems with the dental department.  As soon as Ms. Chiarella was terminated, the monitor Mr. Rhodes began to write the HSA up for problems in the dental department, although the services being provided had not changed one bit.

3. In addition to the information above, I would like to note that the only time the HSA received any type of disciplinary action was directly related to a missing training document went that went missing under suspicious circumstances when the HSA was out of the office for the day.  I was contacted at home by the Regional Director and told that the monitor Mr. Rhodes after seen talking to Ms. Chiarella, came into the medical office and asked for a specific training document, that had been in the office which was accessible by all staff including Ms. Chiarella, but was nowhere to be found when Mr. Rhodes came looking for that specific training record-all the other records were found.  I was written up the next day by the Regional Director-the one and only time of my more than 7 months (most of them receiving a cascade of two-way memos and notices of concerns-that were largely proven unfounded).  Ironically, I was not written up for the missing document, but rather for failing to consistently communicate with the monitor as he would like.

4. The other white female who I was not allowed to discipline was an LPN Cynthia Johnson, although the white female Constance Howell acting HSA had written Ms. Johnson and another white nurse up and suspended Ms. Johnson for several days, and the other nurse terminated; I was not allowed to do so.  Each time Ms. Johnson was set to be disciplined by me, she filed "hostile work environment," charges and I was told that I was not to pursue the disciplinary and I was also subsequently investigated each time.  Near the end of my tenure Ms. Johnson was listed in a notice of concern by Mr. Rhodes in which he stated that he had "low confidence in the HSA..." because I failed to properly supervise my staff.  This was a result of Ms. Johnson deliberately refusing to give a detainee a band aid when he asked for it and the detainee reporting this directly to the monitor.  When this was brought to my attention and I began the write up process for Ms. Johnson, I was again told to halt, because Ms. Johnson had learned of the disciplinary and again reported that I was creating a "hostile work environment."  Some weeks after this, the monitor Mr. Rhodes came into the department to ask me if I had heard that Ms. Johnson had referred to me as "her black mammie ass..." to another white co-worker. When I told him, I had heard that from a white contract nurse, he immediately went to the warden and reported that I had said I heard Ms. Johnson say that and had her removed from the facility as a result.  Interestingly enough once I challenged the statement to the warden that Mr. Rhodes made saying that I told him I heard the remarks firsthand, the next thing that I knew the white contract nurse that had told me of what Ms. Johnson had said, was accused of sexual misconduct by a detainee, as reported by Mr. Rhodes and was terminated.  Since there was no longer a credible witness, Ms. Johnson was given her job back.  I was then investigated for the previous "hostile work environment," charge by Ms. Johnson and again there was no finding of wrongdoing on my part.  Although Ms. Johnson only brought these charges when she was about to be disciplined, I was still told by the investigator that he was glad that things were getting

better between Ms. Johnson and I, because they were getting ready to take those "hostile work environment," charges more seriously-even though there was never any evidence that I was creating a adverse work environment for Ms. Johnson or any one.

5. The other incident of a white employee being removed from under my supervision, after he failed to properly report contraband, and failed to place a white detainee on suicide watch, even though he had hoarded pills to do so. The next day this detainee jumped off the top tier in the housing unit and suffered injuries that left him in a vegetative state. Rather than following the process of suspension and subsequent investigation for failing to report these matters to the black HSA, the black warden or the black chief of security-this white Counselor David Hensley, was allowed to go to another facility and continue to work in his role as a Mental Health Provider and only left after he(Mr. Hensley) decided he no longer wanted to work for Core Civic.

6. Mr. Thomas Corman who was the HSA prior to my coming to Core Civic, had been reported numerous times by the previous contract monitor and it was under his leadership that the facility was placed on probationary accreditation. There were multiple substantiated reports where it was proven that Mr. Corman and the medical department under his supervision failed to provide adequate care, yet Mr. Corman never received a write up from Core Civic superiors and when it was reported by the former US Marshall monitor that he was going to fire him, Core Civic moved Mr. Corman to another Core Civic facility in the same role. While under his leadership there were several adverse inmate events, including deaths and yet Mr. Corman could continue in his role for several months. On the other hand with no proven mismanagement or proof of providing inadequate care including no deaths and only one instance of bodily harm that was caused by gross negligence on the part of the white male mental health counselor David Hensley; and yet I was only given the option of a considerable demotion or resign, I was not even offered a mid-level management position, I was offered the position of a staff nurse at another Core Civic facility.

7. During my time at Core Civic, I successfully lead the department through 3 critical audits, including the NCCHC audit that had placed the facility on probationary accreditation under Mr. Corman's leadership. I tripled the number of medical department staff, despite the challenges of delayed approval for start dates. Several policies were created and implemented under my leadership and according to my Regional Director Mary Price, the NCCHC auditors applauded us for an incredible turn around of a failing facility. Despite these accomplishments, I was suspended 2 days before the NCCHC audit was supposed to be conducted, because Mr. Rhodes the monitor, was threatening my job. I would later be told by my Warden and my other Nursing Leadership that I was not suspended for poor job performance, but rather for my protection to keep Mr. Rhodes from having me fired. I was also told that while I was doing a fantastic job as the leader of the medical department, I was not getting along with the monitor, so therefore they were going to bring me back, but this time they were bringing in a white male(Stacy Giles) to show me how to deal with the administrative part of getting along with the monitor.

8. The incident that lead to my suspension occurred one evening before I was leaving to go home. We had a detainee that was in a special room due to her being unable, because of her size, to be in a normal cell. The detainee's catheter had been dislodged and she was refusing all attempts by nursing staff (myself included) to re-insert it. Prior to my leaving I contacted our on call provider and got an order for the detainee to be sent out to the hospital to have the catheter reinserted and the evening staff were just waiting on the non-emergency transport to take her

to the hospital for the process. As I was exiting the building, I encountered Mr. Rhodes the monitor, and spent several minutes explaining to him, what the issue was and stating there was already an order for her to go to the hospital to get it replaced. He thanked me and continued to see the detainee. Less than 10 minutes after I left the facility, I was contacted by my Regional stating that if I did not return to the facility immediately, he was going to have me terminated, stating that I had abandoned a patient, although all of the evening nursing staff of 4 nurses were still on duty. Later after I returned and the patient went to the hospital, I was told by the Assistant Warden Chapa that I had been place on administrative leave while it was further investigated, even though Mr. Rhodes had been given a full face to face accounting before I left the premises. Once I was brought back to work-Mr. Giles was there to show me how to navigate dealing with management. I had a conversation with Mr. Giles stating that it did not matter what he showed me, he was not going to be treated the same way by Mr. Rhodes because he was a white male, Mr. Giles agreed that was true.

9. Shortly after coming back was when Ms. Chiarella was terminated and after that I received two memos and notices of concerns daily and on more than one occasion was verbally reprimanded by Mr. Rhodes, although few if any of the allegations he was making were proven to be true. Eventually I was called into the warden's office and offered a demotion to staff nurse at another facility or resignation, I chose resignation because when I asked if I could take an open HSA position at another Core Civic like Mr. Corman had, I was denied. The final proof I would offer is that about a month after I had resigned although from Core Civic- the US Monitor Supervisor at the recommendation of the monitor Mr. Rhodes awarded Mr. Stacy Giles a medal claiming it was the greatest turn around of a department he had seen, but none of those changes occurred under Mr. Giles leadership they occurred under mine. In fact, for the little time that Mr. Giles the HSA role, the department began to deteriorate, with multiple staff resigning, 2 detainee deaths, delayed services for detainees all within the span of about 30 days. While I was demoted for my leadership skills that essentially saved the facility-Mr. Giles was rewarded for the work I had done and not held accountable for the detriments that occurred under his brief leadership (he resigned shortly thereafter).

10. I repeated went to the warden, assistant warden, my Regional Nurse manager and Regional Director with my concerns about racial discrimination and was repeatedly told that nothing could be done because the monitor had too much power and in fact I was once told by my white Regional Director Steve that if I wanted to get along with Mr. Rhodes and keep my job, I was going to have to learn how to "kiss his ass."

11. I do not believe that any of the claims were addressed during the investigation and none of the witnesses were interviewed. Further indication of racial discrimination I believe, that following my being forced out the entire leadership made up of people of color were either reassigned and demoted, or reassigned out of state or also forced to resign. This only occurred after the failing facility was turned around and the contract saved, by an administrative that consisted of an African American Warden, A Latino Assistant Warden, An African American Chief of Security and An African American Female Regional Nursing Manager. None of these personnel actions occurred until after 3 successful audits after years of deficiencies and after being removed from probationary status under our leadership.

Content-Type: text/html

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## U.S. District Court

## Western District of Tennessee

**Notice of Electronic Filing**
The following transaction was entered on 12/1/2020 at 6:54 PM CST and filed on 12/1/2020

| | |
|---|---|
| **Case Name:** | Crosby v. Core Civic |
| **Case Number:** | 2:20-cv-02847-TLP-tmp |
| **Filer:** | |
| **Document Number:** | 7 |

**Docket Text:**
**REPORT AND RECOMMENDATIONS re [1] Pro Se Complaint filed by PuRita Crosby. Objections to R&R due by 12/15/2020. Signed by Chief Magistrate Judge Tu M. Pham on 12/1/20. (jrs)**

**2:20-cv-02847-TLP-tmp Notice has been electronically mailed to:**
**2:20-cv-02847-TLP-tmp Notice will not be electronically mailed to:**
PuRita Crosby
4853 Seed Tick Road
Lakeland, TN 38002

The following document(s) are associated with this transaction:

CASENO:    2:20cv02847
DOCUMENT: 7

PuRita Crosby
4853 Seed Tick Road
Lakeland, TN 38002

Appeal of Decision
P. Crosby

ELECTRONIC FILING AND NOTIFICATION ARE NOW MANDATORY IN
THE WESTERN DISTRICT OF TENNESSEE. PLEASE VISIT
http://www.tnwd.uscourts.gov/ FOR INFORMATION ON SIGNING
UP FOR ELECTRONIC FILING AND NOTIFICATION.

CASENO:    2:20cv02847
DOCUMENT: 6

PuRita Crosby
4853 Seed Tick Road
Lakeland, TN 38002

ELECTRONIC FILING AND NOTIFICATION ARE NOW MANDATORY IN
THE WESTERN DISTRICT OF TENNESSEE. PLEASE VISIT
http://www.tnwd.uscourts.gov/ FOR INFORMATION ON SIGNING
UP FOR ELECTRONIC FILING AND NOTIFICATION.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| PURITA CROSBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 20-2847-TLP-tmp |
| | ) | |
| CORE CIVIC, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS*

On November 19, 2020, plaintiff PuRita Crosby, filed a *pro se* complaint and a motion to proceed *in forma pauperis*. (ECF Nos. 1 & 2.) Pursuant to Administrative Order No. 2013-05, this case has been referred to the United States magistrate judge for management and for all pretrial matters for determination and/or report and recommendation as appropriate.

Federal law provides that the Clerk of each district court shall require parties instituting any civil action, suit or proceeding in such court, whether by original process, removal or otherwise, to pay a filing fee of $400.[1] 28 U.S.C. § 1914(a).

---

[1]Twenty-eight U.S.C. § 1914(a) requires a civil filing fee of $350. However, pursuant to § 1914(b), "[t]he clerk shall collect from the parties such additional fees only as are prescribed by the Judicial Conference of the United States." The Judicial Conference has prescribed, effective May 1, 2013, an additional

To ensure access to the courts, however, 28 U.S.C. § 1915(a) permits an indigent plaintiff to avoid payment of filing fees by filing an *in forma pauperis* affidavit. Under that section, the court must conduct a satisfactory inquiry into the plaintiff's ability to pay the filing fee and prosecute the lawsuit. A plaintiff seeking *in forma pauperis* status must respond fully to the questions on the court's *in forma pauperis* form and execute the affidavit in compliance with the certification requirements contained in 28 U.S.C. § 1746.

In this case, the plaintiff has submitted a properly completed *in forma pauperis* affidavit. The information set forth in the affidavit satisfies the plaintiffs' burden of demonstrating that she is unable to pay the civil filing fee. Accordingly, the motion to proceed *in forma pauperis* is GRANTED.

Plaintiff shall promptly notify the Clerk in writing of any current address. Failure to comply with this requirement, or any other order of the court, may result in the dismissal of this case without further notice.

Pursuant to 28 U.S.C. § 1915(e)(2)(B) and Local Rule

---

administrative fee of $50 for filing any civil case, except for cases seeking habeas corpus and cases in which the plaintiff is granted leave to proceed *in forma pauperis* under 28 U.S.C. § 1915. As the court is granting leave to proceed *in forma pauperis* in this case pursuant to § 1915, the plaintiff is not liable for the additional $50 fee.

-2-

4.1(b)(2), the court will conduct a screening of the complaint to determine whether or not summons should be issued by the Clerk.  No further action is required of the defendant until the court has completed its screening of the complaint.  In the event the court directs the Clerk to issue summons, process will be served by the U.S. Marshal in accordance with 28 U.S.C. § 1915(d) and Fed. R. Civ. P. 4(c)(3).

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

December 1, 2020
Date

-3-

Content-Type: text/html

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Western District of Tennessee

**Notice of Electronic Filing**
The following transaction was entered on 12/1/2020 at 2:32 PM CST and filed on 12/1/2020

| | |
|---|---|
| **Case Name:** | Crosby v. Core Civic |
| **Case Number:** | 2:20-cv-02847-TLP-tmp |
| **Filer:** | |
| **Document Number:** | 6 |

**Docket Text:**
**ORDER granting [2] Motion for Leave to Proceed in forma pauperis. Signed by Chief Magistrate Judge Tu M. Pham on 12/1/20. (jrs)**

**2:20-cv-02847-TLP-tmp Notice has been electronically mailed to:**
**2:20-cv-02847-TLP-tmp Notice will not be electronically mailed to:**
PuRita Crosby
4853 Seed Tick Road
Lakeland, TN 38002

The following document(s) are associated with this transaction:

Content-Type: text/html

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court

Western District of Tennessee

Notice of Electronic Filing

Case Name:

Case Number:

Filer:

Document Number:

2:20-cv-02847-TLP-tmp Notice has been electronically mailed to:

2:20-cv-02847-TLP-tmp Notice will not be electronically mailed to:

Publia Crosby
688 - Seed Tick Road
Lakeland, TN 38002

The following document(s) are associated with this transaction: