```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TENNESSEE
                     WESTERN DIVISION
```
_____

| | |
|---|---|
| **PURITA CROSBY,** | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   No. 20-02847-TLP-tmp |
| | ) |
| **CORECIVIC OF TENNESSEE, LLC,** | ) |
| | ) |
|     Defendant. | ) |

_____

### REPORT AND RECOMMENDATION
_____

Before the court is defendant CoreCivic of Tennessee, LLC's ("CoreCivic") Motion to Dismiss or for Judgment on the Pleadings against plaintiff PuRita Crosby filed on December 20, 2021. (ECF No. 24.) Crosby filed a response on January 31, 2022. (ECF No. 28.) For the below reasons, the undersigned recommends that CoreCivic's Motion to Dismiss be granted.

### I. PROPOSED FINDINGS OF FACT

**A. Crosby's Claims**

This is a case about race and age discrimination. PuRita Crosby, a Black woman, was hired by CoreCivic as a Health Services Administrator on July 31, 2018.[1] (ECF No. 1 at 4.) She was over 40 years old at the time she was hired. (Id.) In her role, Crosby

---

[1] Given the operative legal standard, the court accepts all well-pleaded allegations in Crosby's complaint as true.

"was responsible for all things medical, dental, and mental health related" at the West Tennessee Detention Facility in Mason, Tennessee ("Mason"). (ECF No. 14 at 1.) CoreCivic contracted with the U.S. Marshals Service to house federal detainees awaiting trial and sentencing at Mason, and the contract included "2 tools that were used to address concerns" the Marshals had about CoreCivic's services: the two-way memo and the "much graver" notice of concern. (Id. at 1-2.) These were filed by the Marshals' "Contract Monitor" for Mason, who would use them to address "grievances filed by the detainees regarding their medical care." (Id. at 2.)

Crosby encountered numerous issues with Mason's Contract Monitor, Kareem Rhodes, who consistently filed baseless two-way memos and notices of concern regarding her management. (Id.) Many of these complaints were based on the behavior of and false allegations by a white female nurse at Mason. This nurse made racist comments about Crosby to other nurses,[2] but Crosby was told she was not allowed to discipline the nurse "because [the nurse] had filed hostile work environment against me after I had initiated the disciplinary process." (Id.) This was not new to Crosby, who

---

[2]According to Crosby, another white nurse told Rhodes that the nurse reportedly said that "corporate was going to come down and walk [Crosby's] black mammy ass out of here." Rhodes informed Crosby and the nurse who made these comments was put on administrative leave. (ECF No. 14 at 2.) However, Rhodes also fired the nurse who reported the incident only 2 days later, allegedly for having "improper relations" with a detainee. (Id. at 2-3.)

found she was typically told by "corporate offices" to hold off on disciplining any white staff members for their misconduct. (Id.) For example, Crosby was not allowed to discipline a white female dental assistant who was close to Rhodes, despite this dental assistant bringing contraband into Mason, destroying documentation, and making racist remarks.[3] (Id. at 3.) While the dental assistant was eventually terminated, it was only after a separate corporate investigation revealed she had falsified medical documentation. (Id.)

Rhodes was also the central figure in the two main incidents that led to Crosby's eventual resignation, done under threat of either termination or demotion. First, on a day that Crosby was not at Mason, Rhodes came to her department "asking for a specific piece of documentation that was kept in a log in the secretary's office." (Id.) Crosby had placed the document in the log days before "but after the [above described] dental assistant came into the office," the document went missing. This incident led to "the only disciplinary write up [Crosby] received as H.S.A" and caused her to be placed on a Personal Improvement Plan ("PIP"). (Id.)

---

[3]The dental assistant allegedly told others that "you always know it's going to be a mess when these kind are in charge," referring to Crosby. (ECF No. 14 at 3.) She and Rhodes also allegedly disparaged Crosby together, stating that "you know how when we were in the service, how there were people you just didn't want to have around you because they were so incompetent[?] That's her." (Id.)

Crosby was on the PIP from around January 15, 2019, until her resignation. (ECF No. 1 at 4.) Other employees, including Crosby's white male H.S.A. predecessor, had committed significantly more serious infractions "that often resulted in harm or even death" to detainees and had not been put on PIPs. (ECF No. 14 at 3.) Second, Rhodes ordered Crosby to personally care for a specially housed detainee who was having issues with a catheter that needed to be re-inserted. (Id. at 4.) Crosby had already developed a plan to care for this patient and ordered that the patient be taken to the hospital if she would not allow the on-site staff to replace the catheter. (Id.) Crosby informed Rhodes of this plan before leaving the office that day but received a call from regional management "approximately 10-15 minutes after leaving" telling her that Rhodes had ordered her to return and personally care for the patient. (Id.) After returning and sending the patient out to the hospital, Crosby was "called into the Assistant Warden's office and placed on Administrative leave" without clear indication as to why. (Id.) Crosby was on leave from January 24, 2019, through February 4, 2019. (ECF No. 1 at 4.) She returned to work after an "NCCHC audit was touted as one of the best they had seen at the facility," but despite this success, Crosby was given a white male "mentor" who would "show [her] how to deal with the monitor." (ECF No. 14 at 4.) This mentor told Crosby that she had not "done anything wrong," but that "with some of these monitors you have to

- 4 -

be prepared to kiss their asses . . . because they hold the strings." (Id.) The mentor also later agreed with Crosby that she would be treated differently since she was not a white male, and suggested that she "might want to just leave because it was not going to get better." (Id. at 5.)

Crosby's time at CoreCivic ended abruptly on March 14, 2019. (ECF No. 1 at 4.) She was called into the Mason Warden's office, where the head of Human Resources and the Assistant Warden were waiting with "the CNO" and Crosby's "Regional" joining on a conference call. (ECF No. 14 at 5.) The CNO told Crosby that they "need a strong leader over there and I'm just not seeing it" and offered her a staff nurse position at a new facility. (Id.) The CNO explained that they could not offer Crosby another H.S.A. position due to her PIP. (Id.) Crosby "chose to step down" instead, as she was "not comfortable to continue working for a company where [she] had been continuously discriminated against because [she] was an African American woman." (Id.) Crosby was replaced by the white male mentor she had previously been assigned, who only three weeks later was awarded a "Marshal's star" for the "best turn around of a medical department," which Crosby alleges was "based on the very work [she] had done" while on the job. (Id.)

On November 21, 2019, Crosby filed a Charge of Discrimination with the EEOC, alleging race and age discrimination by CoreCivic (ECF No. 1 at 5.) She received a right to sue letter from the EEOC

on August 29, 2020, and filed the present suit on November 19, 2020. (Id.) CoreCivic moved to dismiss the suit on December 20, 2021, alleging that Crosby does not have standing and that her claims are barred under the doctrine of judicial estoppel. (ECF No. 24 at 1.)

**B.   Crosby's Bankruptcy Proceedings**

Separate from the above but relevant to the present motion, Crosby filed for Chapter 13 Bankruptcy on December 2, 2016.[4] (ECF No. 24-3 at 2.) In her draft Chapter 13 Plan and Chapter 13 Petition, Crosby did not indicate that she possessed any potential or active claims against third parties. (Id. at 14.) Based on these filings, the Bankruptcy Court later confirmed Crosby's Chapter 13 Plan in an order. (ECF No. 24-5.)

This plan is "still active and open" as of January 30, 2022. (ECF No. 28 at 2.) Since approval, Crosby has only moved to amend the plan once. On June 11, 2020, Crosby filed a "Motion of Debtor to Reduce Payments and Extend Plan Payments Under Coronavirus Aid, Relief, and Economic Security Act." (ECF No. 24-7 at 2.) In that

---

[4] Much of this section and CoreCivic's argument relies on filings from Crosby's separate bankruptcy proceedings that CoreCivic attached as exhibits to their motion to dismiss. The undersigned takes judicial notice of these filings. Akins v. U.S. Bank, Nat'l Ass'n, No. 18-2725, 2019 WL 1495300, at *4 (W.D. Tenn. Apr. 4, 2019) (citing Buck v. Thomas Cooley Law Sch., 597 F.3d 812, 816 (6th Cir. 2010) ("A court may take judicial notice of other court proceedings without converting the motion into one for summary judgment.")).

motion, Crosby stated that she was having difficulty maintaining her living expenses and sought to have her biweekly payment rate reduced. (Id.) The Bankruptcy Court granted the motion on July 24, 2020, ordering that Crosby's payment plan be extended 24 additional months and that "the Chapter 13 Trustee shall reduce the plan payment accordingly." (ECF No. 24-8 at 2-3.) The docket does not reflect any further changes to the bankruptcy plan. (ECF No. 24-9 at 15-16.)

## II. PROPOSED CONCLUSIONS OF LAW

### A. Standard of Review

The present motion is brought as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), or alternatively as a motion for judgment on the pleadings under Rule 12(c). Since "in the Sixth Circuit, a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is reviewed under the same standard applicable to a motion to dismiss under Rule 12(b)(6)," the undersigned lays out that standard below and finds it applicable to all arguments in the motion. Adkisson v. Jacobs Engineering Group, Inc., 342 F. Supp. 3d 791, 808 (E.D. Tenn. 2018) (quoting Avalon Health Care, LLC. V. Trustmark Ins. Co., 471 F. Supp. 2d 869, 871 (M.D. Tenn. 2007)); see also Ziegler v. IBP Hog Mkt., Inc., 249 F.3d 509, 511-12 (6th Cir. 2001).

To avoid dismissal for failure to state a claim under Rule 12(b)(6), "'a complaint must contain sufficient factual matter,

- 7 -

accepted as true, to state a claim to relief that is plausible on its face.'" Hill v. Lappin, 630 F.3d 468, 470-71 (6th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); see also Fed. R. Civ. P. 12(b)(6). "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Center for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 369 (6th Cir. 2011) (quoting Iqbal, 556 U.S. at 678). Without factual allegations in support, mere legal conclusions are not entitled to the assumption of truth. Iqbal, 556 U.S. at 679.

While courts liberally construe *pro se* pleadings, even a *pro se* complaint must satisfy the plausibility standard. Barnett v. Luttrell, 414 F. App'x 784, 786 (6th Cir. 2011); see also Pilgrim v. Littlefield, 92 F.3d 413, 416 (6th Cir. 1996) ("[T]he lenient treatment generally accorded to pro se litigants has limits."). "Courts 'have no obligation to act as counsel or paralegal' to *pro se* litigants." Matthews v. City of Memphis, No. 2:14-cv-02094, 2014 WL 3049906, at *1 (W.D. Tenn. July 3, 2014) (quoting Pliler v. Ford, 542 U.S. 225, 231 (2004)). "Courts are also not 'required to create' a *pro se* litigant's claim for him." Id. (quoting Payne v. Sec'y of Treas., 73 F. App'x 836, 837 (6th Cir. 2003)).

**B.   Judicial Estoppel**

CoreCivic argues that Crosby's claims should be dismissed under the doctrine of judicial estoppel. Judicial estoppel is an equitable, discretionary doctrine designed to "preserve the integrity of the courts and to prevent parties from abusing the judicial process through cynical gamesmanship." Middleton v. Voight & Schweitzer, LLC, No. 2:20-cv-02015-TLP-atc, 2021 WL 4499452, at *4 (W.D. Tenn. Sept. 30, 2021) (quoting White v. Wyndham Vacation Ownership, Inc., 617 F.3d 472, 476 (6th Cir. 2010) (internal quotation marks omitted)). The doctrine is typically invoked to dismiss claims where a party prevails in one case by relying on a certain argument and then "rel[ies] on a contradictory argument to prevail in another." New Hampshire v. Maine, 532 U.S. 742, 749 (2001). CoreCivic argues that because Crosby did not disclose her employment discrimination claims to the Bankruptcy Court, and the Bankruptcy Court approved her bankruptcy plan based on that representation, she is barred from asserting those claims here.

The Sixth Circuit has previously dealt with similar factual scenarios and articulated "guiding factors to consider in assessing whether judicial estoppel should function to bar a claim." Davis v. Fiat Chrysler Automobiles U.S., LLC, 747 F. App'x 309, 313 (6th Cir. 2018). In the bankruptcy context, judicial estoppel will bar a claim when:

>     (1) a party assumed a position that was contrary to the
>     one that she asserted under oath in the bankruptcy
>     proceedings, (2) the bankruptcy court adopted the
>     contrary position either as a preliminary matter or as
>     part of a final disposition, and (3) the omission did
>     not result from mistake or inadvertence.

Id. (quoting White, 617 F.3d at 478). The second prong is satisfied when a bankruptcy court confirms a bankruptcy plan; the court has "adopted" the debtor's statement that a claim does or does not exist. Id. at 314; see also Reynolds v. Comm'r, 861 F.2d 469, 473 (6th Cir. 1988) ("[W]hen a bankruptcy court — which must protect the interests of all creditors — approves a payment from the bankruptcy estate on the basis of a party's assertion of a given position, that, in our view, is sufficient 'judicial acceptance' to estop the party from later advancing an inconsistent position.") Since the debtor's duty to reveal potential claims as assets is ongoing, Clarke, 421 B.R. at 444, failure to amend or alert the Bankruptcy Court of any claims that arise while a bankruptcy plan is operative qualifies as assuming a position that no claim exists. See Bohanan v. Bridgestone/Firestone N. Am. Tire, LLC, No. 3:06cv122, 2007 WL 1091209, at *6-7 (M.D. Tenn. Apr. 10, 2007) (failure to amend bankruptcy schedules with claim that arose two years after bankruptcy plan was filed justified judicial estoppel), aff'd, 260 F. App'x 905 (6th Cir. 2008); see also Clarke v. United Parcel Serv., Inc., 421 B.R. 436, 445 (W.D. Tenn. 2010) ("Clarke failed to amend her bankruptcy schedules at any time prior

- 10 -

to UPS's filing of its Motion to Dismiss . . . Clarke is now asserting a position in this lawsuit that is contrary to the position she took under oath in a prior proceeding[.]").

Crosby's bankruptcy plan was initially approved in 2016. (ECF No. 24-5.) At the time, she listed no potential legal claims as assets. (ECF No. 24-3 at 15.) While the claims at issue in this lawsuit did not arise until December 2018 at the earliest, when Crosby alleged the discrimination began, (ECF No. 1), she did not seek to amend her bankruptcy schedules to list the claim once it arose, even when moving for the court to reduce her payment amounts in June 2020. (ECF No. 24-7 at 2.) For her claims to avoid judicial estoppel, Crosby must show that the failure to amend was due to inadvertence or mistake.

"In determining whether [Crosby's] conduct resulted from mistake or inadvertence, this court considers whether: (1) she lacked knowledge of the factual basis of the undisclosed claims; (2) she had a motive for concealment; and (3) the evidence indicates an absence of bad faith." White, 617 F.3d at 478. A Chapter 13 debtor is presumed to have a motive for concealment, "since it is always in a Chapter 13 petitioner's interest to minimize income and assets." Lewis, 141 F. App'x at 425. If the first two prongs are satisfied, then "the burden of establishing the absence of bad faith is on the plaintiff." Cruse v. Sun Prods. Corp., 221 F. Supp. 3d 990, 997 (W.D. Tenn. 2016) (quoting Walker

v. Moldex Metric, Inc., No. 2:10-CV-164, 2011 WL 3044529, at *4 (E.D. Tenn. Jul. 25, 2011)). The bad faith inquiry has a "particular focus on any attempt to advise the bankruptcy court of an omitted claim," Davis, 747 F. App'x at 316 (citing White, 617 F.3d at 478), as well as if those efforts were effective. Eubanks v. CBSK Fin. Grp., Inc., 385 F.3d 894, 895-97 (6th Cir. 2004). Efforts made before a motion to dismiss for judicial estoppel is filed "are more important than efforts that c[o]me after the Defendants fil[e] their motion to dismiss." White, 617 F.3d at 480.

At the latest, Crosby possessed knowledge of the factual basis of her claims when she filed her Charge of Discrimination with the EEOC on November 21, 2019. (ECF No. 1 at 5.) She cannot argue that she lacked knowledge of them while her bankruptcy claim was pending, since it is still pending as of the date of this report and recommendation. (ECF No. 28 at 2.) Further, under Sixth Circuit precedent, her status as a Chapter 13 debtor automatically provides her with a motive for concealment. Crosby must thus present evidence to show an absence of bad faith, with emphasis given to evidence of any efforts to alert the Bankruptcy Court of her present claims.

Crosby has not produced such evidence. There is no evidence she has attempted to alert the Bankruptcy Court of her claims here, and in her response to the present motion she characterized her

bankruptcy case as "still active and open and ha[ving] no true connection to the discrimination complaint[.]" (ECF No. 28 at 2.) She has provided no communications, notices, or other documents that show attempts to alert the Bankruptcy Court of her claims before CoreCivic's Motion to Dismiss was filed. While her response may imply a misunderstanding of her duty to disclose, such a misunderstanding "does not demonstrate an absence of bad faith." Payne v. Cent. Def. Servs., LLC, No. 2:11-cv-2664, 2013 WL 3974575, at *6 (W.D. Tenn. Jun. 13, 2013), adopted by, 2013 WL 3974575, at *1-2 (W.D. Tenn. Aug. 2, 2013). She has not met her burden under Sixth Circuit precedent. Given that she possessed knowledge of the factual basis of her claims and had a motive for concealment, the undersigned does not find that the omission of her claims from the Bankruptcy Court was the result of inadvertence or mistake. With all other factors satisfied as well, the application of judicial estoppel to Crosby's claims is appropriate under Sixth Circuit law.[5]

---

[5] While CoreCivic also argues that Crosby does not have standing to bring her claims due to the "Sixth Circuit's general rule that Chapter 13 debtors do not have standing to pursue independent claims," the undersigned finds it unnecessary to rule on this question given the clear application of judicial estoppel. Hamilton v. Shelby Cty., Tennessee, No. 20-cv-2911-TMP, 2021 WL 1759859, at *3 (W.D. Tenn. May 4, 2021) (citing Rugiero v. Nationstar Mortg., LLC, 580 F. App'x 376 (6th Cir. 2014)). Further, the undersigned notes that the holding of Rugiero, which is the only source of this "general rule," has been called into question by other courts, Sixth Circuit district courts, and even one Sixth Circuit panel. See Kolesar v. Allstate Ins. Co., 814 F. App'x 988,

As an aside, the undersigned has previously noted that "the doctrine of judicial estoppel may yield potentially harsh results." See Payne, 2013 WL 3974575, at *6 (citing White, 617 F.3d at 486-87 (Clay, J., dissenting) (noting that the White test "places the entire burden on Plaintiff to show an absence of bad faith and places little or no burden on Defendant to show the existence of bad faith.") (internal citations omitted)). As the presiding district judge has also recently stated, "employing judicial estoppel too hastily – or without clear cause – could instead stunt the inherent truth-seeking function of the court." Middleton, 2021 WL 4499452 at *6; see also Slater v. United States Steel Corporation, 871 F.3d 1174, 1185-86 (11th Cir. 2017) (unanimous en banc) (adopting a new test for judicial estoppel requiring courts "to look to all the facts and circumstances of the case to decide whether a plaintiff intended to mislead the

---

990 (6th Cir. 2020) (collecting cases from other circuits disagreeing with Rugiero as applied to Chapter 13 claims); In re Connor, -- B.R. --, 2022 WL 108359, at *3-4 (Bankr. M.D. Tenn. Jan. 4, 2022) (discussing the "broad language in that unpublished case that could be interpreted as saying that a Chapter 13 debtor could never have standing to bring a pre-petition claim" and noting that "[this] interpretation seems unlikely to prevail if the Sixth Circuit is given the right opportunity to address the matter in a reported case."); see also Dufrene v. ConAgra Foods, Inc., 196 F. Supp. 3d 979, 982-83 (D. Minn. 2016) (stating that only the Sixth Circuit has held "that a Chapter 13 debtor lacks standing to pursue causes of action that belong to the bankruptcy estate" and that Rugerio "includes limited analysis and relies exclusively on cases involving Chapter 7 debtors, without addressing the differences between Chapter 7 debtors and Chapter 13 debtors.").

court because that question is separate from and not answered by whether the plaintiff voluntarily, as opposed to inadvertently, omitted assets.").

### III. RECOMMENDATION

For the above reasons, the undersigned recommends that CoreCivic's Motion to Dismiss be granted.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

February 14, 2022
Date

### NOTICE

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS. ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R. 72.1(g)(2). FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**